# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 16-20332-CR-SCOLA/OTAZO-REYES

UNITED STATES OF AMERICA,

v.

DAVID RAPHAEL CONCEPCION,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendant David Raphael Concepcion's ("Defendant" or "Concepcion") Motion to Suppress Regarding August 2012 Incident (hereafter, "First Motion to Suppress") [D.E. 32]; and Defendant's Motion to Suppress Regarding October 2015 Incident (hereafter, "Second Motion to Suppress") [D.E. 33] (collectively, "Motions to Suppress"). These matters were referred to the undersigned by the Honorable Robert N. Scola, Jr., United States District Judge, pursuant to Title 28, United States Code, Section 636 [D.E. 35]. The undersigned held evidentiary hearings on these matters on March 24 and 28, and June 29, 2017 [D.E. 49, 53, 79]. For the reasons stated below, the undersigned respectfully recommends that Defendant's Motions to Suppress be DENIED.

## PROCEDURAL BACKGROUND

On May 6, 2016, Concepcion was charged in a four count indictment with the following offenses:

Count 1:    Possession of a Firearm and Ammunition by a Convicted Felon on August 19, 2012 in violation of 18 U.S.C. § 922(g)(1).

Count 2:    Possession of a Firearm and Ammunition by a Convicted Felon on October 14,

2015 in violation of 18 U.S.C. § 922(g)(1).

Count 3:      Possession with Intent to Distribute a Controlled Substance, namely, marijuana, on October 14, 2015 in violation of 21 U.S.C. § 841(a)(1).

Count 4:      Possession of a Firearm in Furtherance of a Drug Trafficking Crime, as charged in Count 3, on October 14, 2015, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

See Indictment [D.E. 1].

The firearms and ammunition listed in the indictment with respect to Count 1 are: one Fabrique Nationale Herstal Belgium, Model: Five-Seven, 5.7 x 28 millimeter semi-automatic pistol (hereafter, "Herstal pistol"); one Norinco, Model: MAK-90 Sporter, 7.62 x 39 semi-automatic rifle (hereafter, "Norinco rifle"); fourteen rounds of Fabrique Nationale D'Armes De Gueree (FN), 5.7 x 28 millimeter ammunition; and two rounds of "Wolf" manufactured by Tula Cartridge Works, 7.62 x 39 caliber ammunition (collectively, "Count 1 ammunition") (Herstal pistol, Norinco rifle, and ammunition, collectively, "Count 1 firearms and ammunition"). Id. at 2. The firearm and ammunition listed in the indictment with respect to Count 2 are: one Taurus, Model: PT140, 40 S&W caliber semi-automatic pistol (hereafter, "Taurus pistol"); nine rounds of Winchester, 40 S&W rounds; and fifty rounds of "Tulammo" Tula Cartridge Works, 7.62 x 39 caliber ammunition (collectively, "Count 2 ammunition") (Taurus pistol, and ammunition, collectively, "Count 2 firearm and ammunition"). Id.

Concepcion seeks to suppress all of these items, as well as incriminatory statements made by him, on the grounds that: his arrests on August 19, 2012 and October 14, 2015 were illegal; the August 19, 2012 search of the vehicle in which the Norinco rifle and Count 1 ammunition were found was illegal; the October 14, 2015 search of the premises where the Count 2 firearm and ammunition were found was illegal; and his August 19, 2012 and October 14, 2015 pre and post-Miranda statements were illegally obtained.

2

Because the government does not seek to introduce the August 19, 2012 pre-Miranda statements, that issue is moot. With regard to the remaining issues, the government counters that both arrests and searches were legal; that the October 14, 2015 pre-Miranda statements were not the product of police interrogation; and that the August 19, 2012 and October 14, 2015 post-Miranda statements were legally obtained.

## APPLICABLE LAW

### 1. The Fourth Amendment's protection against illegal arrests

The Fourth Amendment protects "the people" from "unreasonable searches and seizures." U.S. Const. amend. IV. A seizure occurs in the context of the Fourth Amendment "whenever a police officer accosts an individual and restrains his freedom to walk away." Michigan v. Summers, 452 U.S. 692, 696 n.5 (1981) (citing Terry v. Ohio, 392 U.S. 1, 16 (1968)). See also Brower v. Cty. of Inyo, 489 U.S. 593, 596-97 (1989) (A Fourth Amendment "seizure" occurs "when there is a governmental termination of freedom of movement *through means intentionally applied.*"). An individual is in custody if, "under the totality of the circumstances, a reasonable man in the [individual's] position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave." United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987). See also United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989) ("A suspect is considered in custody if a reasonable person would believe that he were not free to leave; for example, if the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."). The reasonableness standard embodied in the Fourth Amendment is articulated in "the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by

probable cause." <u>Summers</u>, 452 U.S. at 700.

Whether a warrantless arrest is constitutionally valid depends "upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964). <u>See also</u> <u>United States v. Burgos</u>, 720 F.2d 1520, 1524 n. 4 (11th Cir. 1983) ("Probable cause to arrest exists where the facts and circumstances within the officers' knowledge, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed.").

### 2. Fourth amendment privacy interest

"[A] party alleging an unconstitutional search under the Fourth Amendment must establish *both* a subjective *and* an objective expectation of privacy to succeed." <u>United States v. Robinson</u>, 62 F.3d 1325, 1328 (11th Cir. 1995) (citing <u>United States v. Ford</u>, 34 F.3d 992, 995 (11th Cir. 1994)). "The accused bears the burden of demonstrating a legitimate expectation of privacy in the area searched." <u>United States v Harris</u>, 526 F.3d 1334, 1338 (11th Cir. 2008) (citing <u>United States v. Cooper</u>, 133 F.3d 1394, 1398 (11th Cir.1998)). "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." <u>Rakas v. Illinois</u>, 439 U.S. 128, 133-34 (1978) (citations omitted). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." <u>Id.</u> at 134.

### 3. Warrantless searches

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Mincey v Arizona, 437 U.S. 385, 390 (1978) (citations omitted).

"It is well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." United States v. Freyre-Lazaro, 3 F.3d 1496, 1500-01 (11th Cir. 1993) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).

"[A] protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." Maryland v. Buie, 494 U.S. 325, 335 (1990). "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-36.

For the plain view doctrine to apply, "[i]t is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be 'immediately apparent.'" Horton v. California, 496 U.S. 128, 136 (1990).

**4.** **The Fifth Amendment's protection against self-incrimination**

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V, cl. 2. In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." Missouri v. Seibert, 542 U.S. 600, 608 (2004).

In Seibert the Supreme Court addressed "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." Id. at 604. After giving the Miranda warnings, the officer covers the same ground a second time and obtains a repeated statement. Id. The Supreme Court concluded: "Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with Miranda's constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible." Id.

**5.** **Fruit of the poisonous tree**

Under the long established exclusionary rule, "evidence seized during an unlawful search [can] not constitute proof against the victim of the search." Wong Sun v. United States, 371 U.S. 471, 484 (1963) (citing Weeks v. United States, 232 U.S. 383 (1914)). "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." Id. at 484-85 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)). Moreover, the exclusionary rule applies equally to physical and verbal evidence. Id. at 485. As further explained by the Supreme Court, not "all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt

question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 487-88 (citation and quotation marks omitted).

## **FINDINGS OF FACT**

### **I.**    **Testimonial and documentary evidence**

1.    The following witnesses testified at the March 24 and 28, and June 29, 2017, evidentiary hearings: City of Opa Locka Police Officers Hans Gonzalez ("Officer Gonzalez") and Hugo Alvarado ("Officer Alvarado"); City of Opa Locka Detectives Roberto DeMoya ("Detective DeMoya") and Stanley Jean-Francois ("Detective Jean-Francois"); Defendant's forensic neurology expert Dr. Jeffrey William Colino ("Dr. Colino"); and Defendant's metadata expert Carter Vance Conrad, Jr. ("Mr. Conrad") [D.E. 55-57, 84]. The undersigned finds credible and reliable the hearing testimony of Officers Gonzalez and Alvarado, and that of Detectives DeMoya and Jean-Francois. The undersigned finds Dr. Colino's expert testimony to be speculative and unreliable. The undersigned finds Mr. Conrad's expert testimony to be reliable.

2.    The following documents were admitted into evidence: Government's Exhibits 1A, 1B, 1C, 1D, 2A, 2B, 2C, 2D, 2E, 2F, 2G, 2H, 2I, 3-6; and Defendant's Exhibits 1-11, 13-14, 16-29 [D.E. 54, 92].[1]

### **II.**    **Facts Re: Count 1 (August 19, 2012 Events)**

####    *A.    Officer Gonzalez*

3.    On August 19, 2012 in the early dawn hours, Officer Gonzalez and his supervisor,

---

[1] Government's Exhibit 7 was marked for identification only [D.E. 54]. Defendant's Exhibits 14A and 15-18 were proffered at the March 28, 2017 hearing and were marked for identification only. Id. Defendant's Exhibits 16-18 were re-proffered and admitted at the June 29, 2017 hearing.

Corporal Rick Mendigutia ("Corporal Mendigutia"), were having a coffee break at the parking lot of a restaurant located at 420 Fisherman Street, in Opa Locka.

4.      Upon hearing shots coming from a southern direction, less than ten blocks away, Officer Gonzalez responded in his patrol vehicle, driving west bound on Ali Baba Street, then southbound on the "Connector," and then eastbound on 135th Street.[2]

5.      Based on Corporal Mendigutia's assessment of the origin of the shots, Officer Gonzalez started heading towards an apartment complex known as the "Back Blues" located on Alexandria Drive, in Opa Locka.[3]

6.      While driving eastbound on 135th Street, after going over a railroad track, and upon reaching Cairo Lane, Officer Gonzalez observed a dark-colored Infiniti heading north on Alexandria drive at a high rate of speed, wheels spinning, with no headlights on, running a stop sign, making a left turn onto 135th Street with the wheels spinning, and heading westbound towards the officer's vehicle.[4]

7.      The Infiniti then slowed down hard and passed Officer Gonzalez at regular speed.

8.      Officer Gonzalez then made a U-turn, activated his emergency lights and sirens, and attempted to stop the Infiniti for the traffic infractions of running the stop sign and having no headlights and in connection with the shooting. However, the Infiniti sped up again and fled.

9.      Officer Gonzalez followed the black Infiniti and saw it continue westbound on 135th Street, then north on the Connector/37th Avenue, but he eventually lost sight of the vehicle, which was doing over one hundred miles per hour, at a curve.

---

[2]  The "Connector" is the road known as the Douglas Road/Le Jeune Road Connector.  Officer Gonzalez testified that he turned onto eastbound 135th Street within two minutes of hearing the shots.
[3]  There was no police radio dispatch directing Officer Gonzalez to that location.
[4]  The undersigned takes judicial notice of the fact that Alexandria Drive intersects 135th Street east of Cairo Lane, with no other streets in between the two intersections.

10. Officer Gonzalez kept driving north towards the Palmetto Expressway, trying to locate the vehicle; then he advised Miami Gardens Police Department that the vehicle might be going into their jurisdiction.

11. However, Officer Gonzalez soon learned that a unit from the Opa Locka Police Department had located the vehicle, which had been involved in a rollover accident, at the curve where Officer Gonzalez had lost sight of it; and he responded back to the scene of the crash.[5]

12. When Officer Gonzalez arrived at the crash scene, the Infiniti was still overturned, and Opa Locka Police Officers Horn and Borrero, who had found the vehicle in response to Officer Gonzalez's request for assistance, were there.[6]

13. Officer Gonzalez then proceeded to aid Corporal Mendigutia, who had been chasing another vehicle that had fled eastbound on 135th Street, then north on I-95 to Miami Gardens Drive. Officer Gonzalez joined the pursuit until that vehicle was recovered.

14. Corporal Mendigutia then ordered Officer Gonzalez to report to Jackson Memorial Hospital's Ryder Trauma Center ("Ryder"), where Concepcion and the passenger of the rolled over Infiniti had been transported.

15. Officer Gonzalez arrived at Ryder at approximately 5:00 or 6:00 a.m.

16. When Officer Gonzalez first saw Concepcion, the latter was unconscious. Eventually, Concepcion called Officer Gonzalez over to ask him if the officer involved in the chase was okay, to which Officer Gonzalez responded yes.

17. Concepcion called Officer Gonzalez over a second time to ask again if the chasing officer was okay. At that point, Officer Gonzalez told Concepcion that he was the

---

[5] Officer Gonzalez identified the black Infiniti shown on the crash scene photographs (Gov't Exs. 1C and 1D) as the vehicle that fled from him on August 19, 2012.

[6] On cross-examination, Officer Gonzalez testified that, during the chase, he knew the vehicle was a black Infiniti, and reported it as such over the radio, even though he did not provide that level of detail in his contemporaneous police report.

chasing officer and that he was fine.

18.     In his interactions with Concepcion, Officer Gonzalez did not notice anything different from prior interactions, which had occurred previously on several occasions.

19.     At some point while at Ryder, Officer Gonzalez was ordered to handcuff Concepcion for questioning, which he did.[7]

20.     According to Officer Gonzalez, Concepcion was placed in custody pending further investigation, but had not yet been arrested.

21.     Although Officer Gonzalez was aware that Detectives DeMoya and Jean-Francois, as well as City of Opa Locka Detective Vielman ("Detective Vielman"), had responded to Ryder to interview Concepcion, he did not overhear the conversations between the detectives and Concepcion, since he was several beds down taking care of the Infiniti passenger.

22.     On cross examination, defense counsel challenged the credibility of Officer Gonzalez's testimony by comparing it with the facts set forth in his police report. While there are some differences in the two recitations, the undersigned does not find the differences to be significant.

23.     The undersigned accepts Officer Gonzalez's testimony as an accurate description of his participation in the events of August 19, 2012.

**B.     Detective DeMoya**

24.     On August 19, 2012, at approximately 11:00 a.m. or 12:00 noon, Detective DeMoya was informed that Concepcion had been involved in a shooting at the Back Blues or Gardens West Apartments in Opa Locka, and was called out to Ryder to see him. Detective DeMoya was also aware that Concepcion had been involved in a car accident and that multiple

---

[7] Officer Gonzalez could not remember whether Concepcion was conscious or unconscious when the handcuffs were applied.

firearms had been recovered from inside the vehicle.[8]

25.     Detective DeMoya had had numerous prior dealings with Concepcion in the course of his career at the Opa Locka Police Department. These interactions occurred in connection with narcotics investigations and because Concepcion had been in the company of known gang members.

26.     As a result of the interactions, Detective DeMoya and Concepcion had developed some kind of rapport over the years, with Concepcion always being very respectful of and cordial with the detective.

27.     When Detective DeMoya arrived at Ryder, he saw Concepcion lying in a hospital bed.[9]

28.     Up to that time, Detective DeMoya was aware of only one statement that had been made by Concepcion, requesting to speak to him.[10]

29.     Although Concepcion had not been arrested, he was confined to the hospital bed and DeMoya advised him of his Miranda rights.

30.     During the administration of the Miranda warnings, Concepcion appeared to understand them, was coherent, was aware of Detective DeMoya's identity, and was speaking normally. The way Concepcion acted, the way he spoke, his tone of voice, and the fact that he knew Detective DeMoya's name were all consistent with the dealings Detective DeMoya had had with Concepcion in the past.

31.     Detective DeMoya recorded the Miranda warnings, which Concepcion acknowledged he understood, and the interview (Gov't Ex. 3). Throughout the interview,

---

[8]  As discussed below, only one firearm was inside the vehicle. The other one was outside.
[9]  Detective DeMoya recognized photographs of Concepcion on a hospital bed wearing a neck brace (Gov't Exs. 1A and 1B).
[10]  According to Detective DeMoya, Detective Jean-Francois and Detective Vielman were the source of this statement by Concepcion.

Concepcion appeared to completely understand the questions; and he spoke clearly, elaborating on some of his answers.

32.     In the interview, Concepcion described an impending altercation between him and other individuals (some of which resided at the Back Blues) at an adult entertainment club called "The Office;" and referenced an individual by the name of David Boothe, who turned out to be the passenger on the rolled over Infiniti. Concepcion also referenced a "stick" (street slang for an assault rifle) and described a shoot-out in which others began to fire at him and he began to fire back.

33.     Prior to reading the Miranda rights and conducting the recorded interview, Detective DeMoya spoke to Concepcion about how he was feeling and about the shooting incident in the Back Blues. According to Detective DeMoya, he asked Concepcion the following questions pre-Miranda: what happened; what went down; how did Concepcion end up in this type of situation. The questions to Concepcion about the Infiniti came after the Miranda warning.

34.     Detective DeMoya acknowledged that Detectives Jean-Francois and Vielman were present and within earshot prior to Detective DeMoya giving Concepcion the Miranda warnings and conducting the recorded interview.

35.     The undersigned accepts Detective DeMoya's testimony as an accurate description of his participation in the events of August 19, 2012.

36.     Moreover, the undersigned does not find that Detective Jean-Francois' testimony set forth below, albeit more detailed, conflicts with Detective DeMoya's testimony regarding the pre-Miranda encounter with Concepcion.

## C.   Detective Jean-Francois

37.    On August 19, 2012, Detective Jean-Francois became involved in an investigation related to a shooting and a rollover accident in Opa Locka.

38.    Detective Jean-Francois responded to the crash site, where he viewed the rolled over vehicle.

39.    Detective Jean-Francois saw firearms at the crash site.  One was outside the vehicle.  He also saw what appeared to be a high powered rifle near the driver's side of the vehicle, so he contacted the State Attorney's Office to inquire if he could access it.

40.    From the crash site, Detective Jean-Francois went to the shooting scene, and then to the police station to speak to some witnesses who were there.

41.    One of the witnesses at the police station was Ms. Warren, Concepcion's girlfriend at the time and the owner of the Infiniti.

42.    Detective Jean-Francois interviewed Ms. Warren and obtained a written statement from her regarding Concepcion's use of the Infiniti.  Ms. Warren also signed a consent form authorizing the search of the vehicle.

43.    After completing his investigation at the police station, Detective Jean-Francois responded to Ryder, where he met with Detectives Vielman and DeMoya, as well as Officer Gonzalez.

44.    Before arriving at Ryder, Detective Jean-Francois had learned from Officer Gonzalez that Concepcion wished to speak to Detective DeMoya (who Concepcion knew as "Chino"), but Detective Jean-Francois wanted to try speaking to Concepcion anyway, since he and his partner, Detective Vielman, were the lead agents.

45. Thus, when Detective Jean-Francois arrived at Ryder, he and Detective Vielman asked to speak to Concepcion. However, Concepcion requested to speak to Chino, so Detective Jean-Francois yielded, stepped back, and just listened as Detectives DeMoya and Vielman spoke to Concepcion.

46. At that point, Detective DeMoya started having a conversation with Concepcion about the shooting and obtaining details from Concepcion regarding it.

47. In the course of the conversation, Detective DeMoya showed Concepcion a six-pack photo lineup for Concepcion to identify who had been shooting at him.

48. Concepcion had initially said he was not involved in the shooting, but after being confronted with the finding of firearms in the rolled over Infiniti, Concepcion started admitting that he had been shooting also; and then he asked to speak to Detective DeMoya alone and for Detectives Vielman and Jean-Francois to leave the room, which they did.

49. While Detective Jean-Francois was present, the conversation about the shooting and the viewing of the photo lineup took five to ten minutes.

50. At some point while Detective Jean-Francois was present, Detective DeMoya told Concepcion that his verbal statement was being recorded, but Detective Jean-Francois could not recall if any recording occurred before he left the room.[11]

51. Detective DeMoya questioned Concepcion for approximately 30 minutes after Detectives Jean-Francois and Vielman left the room.

52. The undersigned accepts Detective Jean-Francois' testimony as an accurate description of his participation in the events of August 19, 2012.

---

[11] Because Detective Jean-Francois does not recall the timing of the recording, it cannot be said that his testimony conflicts with Detective DeMoya's testimony that questions about the Infiniti came after the Miranda warning, since the warning was, in fact, recorded.

### D.     Dr. Colino

53.     Dr. Colino was accepted as Defendant's expert in forensic neurology.

54.     Dr. Colino defined executive function as the part of the brain that controls an individual's decision-making; appreciation of the consequences of a decision; and understanding of cause and effect. He also defined suggestibility as the difficulty a person might have in inhibiting an initial response.

55.     Dr. Colino explained how a motor vehicle crash can impair an individual's executive function as follows: the executive function is primarily localized in the frontal lobes of the brain; and the frontal lobe neocortex area is in a very tight bony fossa, known as the anterior fossa, which is quite susceptible to the repercussions of trauma.

56.     In formulating his opinions, Dr. Colino reviewed: the Florida Traffic Crash Report pertaining to the August 19, 2012 rollover of the Infiniti that Concepcion was driving that day (Def's Ex. 1); and a series of four photographs of the crash (Def's Ex. 3).

57.     Dr. Colino found the following information contained in the Florida Traffic Crash Report to be significant in determining the effect of the crash on any brain injury that Concepcion may have experienced: the fairly high speed of the vehicle (70 miles per hour); and the way the crash happened (the vehicle hit a curve, there was a loss of control, the vehicle struck a guardrail, became airborne, rotated in the air, and landed on its roof).

58.     Dr. Colino also noted that the photographs depicted significant motor vehicle damage on multiple sides and surfaces, and that the car had been flipped on its roof.

59.     Dr. Colino opined that it is highly probable that the driver of the vehicle suffered a traumatic brain injury, especially given the report that he was unrestrained.

60.     Dr. Colino also reviewed the fire rescue report (Def's Ex. 2) and found the

following information significant: a sudden onset of head pain; the use of a cervical collar and backboard;[12] Concepcion's inability to sign an authorization form because he was mentally incapable; his not being oriented as to time; and a Glascow Coma Scale ("GCS") score of 13 out of 15 at the time he was being transported to Ryder.[13]

61.     Dr. Colino also reviewed Concepcion's medical records from Jackson Memorial Hospital ("Jackson") regarding his treatment at Ryder (where he was taken by Medevac helicopter) and during his subsequent stay until August 20, 2012.[14]

62.     According to Dr. Colino, medical personnel appeared to follow a protocol for traumatic brain injury ("TBI"), based on a referral to the intermediate head injury service. However, Dr. Colino acknowledged that the problem list that was initially recorded by medical personnel was limited to back injury and oral mass; and that the injury description was mild TBI facial and head contusions.

63.     Dr. Colino also noted that Concepcion's facial contusions were documented and that the plan of action included placement in the "ortho spine" service (which is run by the neurology department), but not in any intensive care, neurology or neurosurgery setting.

64.     With regard to the GCS score, Dr. Colino acknowledged that the medical records reflected three scores of 15 on August 19 and 20, 2012 from tests conducted by three different doctors (Gov't Ex. 6 at DC-Defense-000163). Dr. Colino opined that the GCS score does not provide a way to assess executive function, yet he found the single score of 13 shown on the fire

---

[12] When fire rescue arrived, Concepcion had been placed in the back of a police car and didn't remember where he was.

[13] The GCS is the most common scoring system used to describe the level of consciousness in a person following a traumatic brain injury. The possible scores are: 3-8 (severe); 9-12 (moderate); and 13-15 (mild). See https://www.brainline.org/article/what-glasgow-coma-scale. Dr. Colino noted that the initial GCS score was 15 and attributed the lower score to a decline in Concepcion's central nervous system function.

[14] According to the government, the medical records used by Defendant to question Dr. Colino (Def's Ex. 5) were not complete. The government submitted the complete medical records (Gov't Ex. 6).

rescue report to be significant for purposes of his opinion.

65.     Dr. Colino also noted that a reported reading of 38 for partial pressure of oxygen, may have had an adverse effect on Concepcion's executive functioning for lack of oxygen to the brain, given the normal range of 75 to 100.  However, Dr. Colino acknowledged that, on the morning of the accident, Concepcion was alert to person, place and time and cooperative.

66.     Dr. Colino acknowledged that the result of a Computerized Axial Tomography ("CAT") scan of the brain was normal.

67.     Dr. Colino also noted that the result of a CAT scan of the spine showed that Concepcion suffered fractured vertebrae at C-2 to T-4 (Def's Ex. 9), secondary to trauma. However, Dr. Colino acknowledged that there was no spinal cord injury.

68.     Dr. Colino testified that the fractures influenced his thinking about the mechanism of the injury, and its potential result in a traumatic brain injury.  As explained by Dr. Colino, the fractures demonstrate that a lot of force was transmitted through the cranium, and it was impossible to transfer such an amount of force without disrupting the soft brain tissue.

69.     In explaining that, in his view, the damage was to the frontal lobe, Dr. Colino stated that the frontal lobe is uniquely sensitive to damage in motor vehicle accidents, but acknowledged that other parts of the brain could also sustain damage in those circumstances.

70.     Dr. Colino also opined that a notation "psychiatric, psychosocial orientation: concrete thinking" suggested an impairment of abstract thinking abilities.  However, he acknowledged that there were no reported delusions or hallucinations.

71.     Dr. Colino reviewed photographs of Concepcion at the hospital (Def's Ex. 4), which depicted Concepcion on a hospital bed wearing a cervical collar, with lacerations and contusions on the face.  Dr. Colino concluded that Concepcion had suffered facial, head and

spine trauma as a consequence of the motor vehicle accident and opined that Concepcion had hit his head, although he could not say where.

72.     Based on his review of the medical records and crash scene evidence, Dr. Colino had the following opinion regarding Concepcion's state at the time of his recorded statement on August 19, 2012 at approximately 1:00 p.m.: Concepcion's executive functioning would almost certainly be impaired; and Concepcion would have had a difficult time with abstraction, with understanding rights, with understanding the different behavioral options in front of him (including his right to remain silent), and with inhibiting some of the initial subrational responses that might have come up.

73.     With regard to the recorded statement, Dr. Colino opined that Concepcion was not oriented as to time because, when Detective DeMoya asked him to describe what happened "from point A to point B on Saturday August 12th ... correction;" Concepcion interrupted and said "August 18th" even though the date was actually August 19th.[15]  However, it is clear from Concepcion's statement that the events commenced the night of August 18th, when he was at The Office adult entertainment club.  So, contrary to Dr. Colino's conclusion, Concepcion's reference to August 18th does not necessarily establish that he was not oriented as to time.

74.     Dr. Colino also opined that Concepcion's voice was low in volume and slightly slurred, which, according to Dr. Colino, could be from discomfort, head injury, or whatever alcohol or drugs were consumed before the accident.

75.     Dr. Colino also opined that there was also some lag in the time it took Concepcion to respond to certain questions.

76.     In Dr. Colino's view, Detective DeMoya's statement to Concepcion "I need you

---

[15]  See Transcript of March 24, 2017 Evidentiary Hearing (hereafter, "March 24, 2017 Transcript") [D.E. 57 at 36-37].

to tell me" was essentially a command from an authority figure that played to Concepcion's impaired response inhibition.

77.    Dr. Colino conducted a neurological examination of Concepcion on November 22, 2016.  Dr. Colino's impression of Concepcion's speech pattern at the time was that it was normal in volume and clarity without any appreciable latency.

78.    With regard to Concepcion's motor skills, Dr. Colino found that he had impaired movement of the right arm, which Dr. Colino attributed to trauma.

79.    Dr. Colino ordered a Magnetic Resonance Imaging ("MRI") test, a Magnetic Resonance Angiogram ("MRA") and a Positron Emission Tomography ("PET") scan (Def's Ex. 6), which were conducted on January 19, 2017.

80.    With regard to the MRI, Dr. Colino received a NeuroQuant analysis that showed that Concepcion's brain's right ventricle is abnormally small but that there is no abnormality in the size of the left ventricle (Def's Ex. 7).  According to Dr. Colino, this asymmetrical result is consistent with head trauma.

81.    The NeuroQuant analysis also showed that the pars orbitalis, which is the part of the frontal lobe just above the orbit on the left side, is abnormally small.  According to Dr. Colino, this part of the brain controls executive function.

82.    With regard to the PET scan, Dr. Colino received the interpretation conducted by Dr. Joseph Wu ("Dr. Wu"), an expert in the field (Def's Ex. 8).  Dr. Wu found decreased activity in the frontal cortex of Concepcion's brain relative to the activity in the occipital cortex. According to Dr. Colino, these findings are consistent with brain atrophy and decreased executive function.

83.    Based on these 2017 test results, Dr. Colino opined that, on August 19, 2012 at

1:00 p.m., when Detective DeMoya questioned Concepcion, it would be exceedingly unlikely that Concepcion would have had a full understanding of his Miranda rights; that he would not have had a full understanding of the consequences of giving up those rights; and that his response inhibition would have been impaired.

84.     According to Dr. Colino, the CAT scan of the brain conducted at Jackson would not have shown the swelling of the brain that, in his opinion, caused Concepcion's inability to properly waive his Miranda rights.

85.     However, Dr. Colino acknowledged that he had no information regarding any injuries or illnesses that Concepcion might have sustained since August, 2012 and prior to the 2017 test results.

86.     When asked if, based on the 2017 test results, Concepcion could make executive function decisions at the present time, Dr. Colino said the answer to that question would require neuropsychological testing, which he was not competent to conduct.

87.     The undersigned finds Dr. Colino's opinion that Concepcion suffered traumatic injury to the particular area of the brain that controls executive function, and that such injury caused him to be unable to properly waive his Miranda rights and made him susceptible to Detective DeMoya's command as an authority figure, to be speculative and unreliable.

88.     The contemporaneous medical indicia upon which Dr. Colino relied for this opinion were sparse and contradicted by other findings. Moreover, Dr. Colino's evaluation of Concepcion's demeanor during the recorded interview was based in part on the faulty assumption that he was disoriented as to time. Further, such demeanor evaluation was belied by the testimony of Detective DeMoya and Officer Gonzalez, both of whom had dealt with Concepcion prior to August 19, 2012 and did not find his demeanor to be different from what

they had observed in prior encounters.

89.    Dr. Colino also relied on the results of tests conducted five years after the motor vehicle crash to support his opinion, without any information as to what might have transpired in the interim, and without being able to answer the question of whether the purported executive function impairment was still present.

90.    For these reasons, the undersigned rejects Dr. Colino's expert opinion.

### III.    Facts Re: Counts 2-4 (October 14, 2015 Events)

#### A.    Detective DeMoya

91.    On October 14, 2015, Detective DeMoya was conducting surveillance on the 1300 block of Sharazad Boulevard in Opa Locka, due to increased narcotics activity in that block and the apartment building on the south side of the block, known colloquially as the "APTs".

92.    At approximately 6:20 p.m. while he was parked in an unmarked vehicle, Detective DeMoya saw Concepcion approximately five to ten feet away, leaving 1325 Sharazad Blvd. ("1325 Sharazad") and walking north to south across the street towards 1360 Sharazad Blvd. ("1360 Sharazad"). Detective DeMoya could see baggies of marijuana in his hand.[16]

93.    Detective DeMoya made contact with Officer Alvarado and other Opa Locka patrol officers and directed Officer Alvarado to try to make contact with Concepcion, advising that he was carrying narcotics.

94.    About a minute to a minute and a half after Officer Alvarado's arrival on the

---

[16] On cross examination, defense counsel challenged this recollection because Detective DeMoya had testified at one point in his March 14, 2017 state court deposition that he had seen Concepcion holding a stash of marijuana in his hand, which looked like a Ziploc bag with smaller baggies within the bag; and that he could not see any substances inside the multiple colored baggies clearly. However, at a later point in the deposition, Detective DeMoya added that he saw Concepcion holding what he was carrying with both hands, with the baggies of marijuana or whatever he was holding in the middle. Given this clarification, the undersigned does not find that Detective DeMoya's deposition testimony directly impeaches his evidentiary hearing testimony.

scene, Detective DeMoya heard on the radio that Concepcion was running, and actually saw him running back across the street to 1325 Sharazad from 1360 Sharazad. Detective DeMoya also observed another detective begin to chase Concepcion.

95.     By that time, Detective DeMoya was approximately 30 to 40 feet from Concepcion.

96.     Detective DeMoya headed to 1325 Sharazad and learned from Detective Hanes that she had observed Concepcion run into apartment 2. Detective Hanes pointed out the door where Concepcion had entered the apartment, which was on the west side of the building, and stated that she had not seen him come out.

97.     Detective DeMoya began to attempt a forced entry into apartment 2 to apprehend Concepcion in fresh pursuit. He used a Halligan tool (a crowbar) in his attempt to force open the door through which Concepcion had entered the apartment.[17]

98.     Detective DeMoya explained that the west door of the apartment was the kitchen or back door, while the east door was the living room or front door.

99.     As Detective DeMoya started banging on the back door, trying to set the Halligan tool to get it opened, he heard from the officers who had established a perimeter that Concepcion had come running out the front door and had been placed in custody. It was only a matter of seconds between the moment Detective DeMoya first put the tool to the back door and the time he heard that Concepcion was in custody.

100.    After Concepcion was apprehended at approximately 6:35 p.m., and Detective DeMoya saw him in custody in the exterior yard of 1325 Sharazad, the detective returned to the back door of the apartment, where the Halligan tool was still attached, and started trying to

---

[17] Detective DeMoya recognized the damage done to the door by the crowbar as shown in Def's Ex. 19 (which photograph appears to be similar to Gov't Ex. 2F).

remove it.

101.   As Detective DeMoya was standing by the back door, he heard a woman crying, saw the back door open up, and observed Onneta Mitchell Sweeting ("Ms. Sweeting") come out crying, extremely nervous and shaken up, saying they just ran up in here.[18]

102.   When Ms. Sweeting opened the door, Detective DeMoya perceived a very, very strong smell of marijuana that struck him at the threshold of the premises.

103.   Detective DeMoya then proceeded to conduct a 30 second security sweep of the apartment based on: his knowledge that subjects who were known to be armed and gang members had run, and his fear for the safety of officers and Ms. Sweeting, given her use of the word "they."

104.   Detective DeMoya acknowledged on cross examination that all he had heard on the radio and from Detective Hanes was a reference to Concepcion running to 1325 Sharazad, not multiple people running there.

105.   Detective DeMoya also acknowledged that the purpose of a security sweep is to identify people who could pose a danger to police officers.

106.   Detective DeMoya also acknowledged that a total of approximately seven officers had responded to 1325 Sharazad.

107.   In the course of the security sweep he conducted, with the assistance of some of the officers, Detective DeMoya observed in plain view marijuana, drug paraphernalia, such as rolling papers, and a scale.  No firearms, ammunition, or cash were found at the time, but there were two extended firearms magazines protruding from a dresser drawer.[19]

---

[18]   On cross examination, defense counsel tried to create an inference that Detective DeMoya got Ms. Sweeting to open the back door from the detective's use of the word "finally" when describing Ms. Sweeting's opening of the door.  The undersigned does not find such an inference to be justified.

[19]   Detective DeMoya stated that he did not open the dresser drawer.

108.    One of the photographs taken by Detective DeMoya during the security sweep shows a gloved hand holding a door (Def's Ex. 16 at IMG_1508.JPG).  As noted above, Detective DeMoya testified that he conducted the security sweep with the assistance of some of the officers.

109.    The same photograph shows a folder on a glass table in the living room.  Id. Detective DeMoya acknowledged that it was his file.

110.    After the security sweep, Detective DeMoya arrested Ms. Sweeting right outside the door of the apartment, based on the narcotics found in plain view.

111.    Once the premises were secure, Detective DeMoya decided to apply for a search warrant and after a couple of hours, he obtained one from a state court judge (Def's Exs. 20, 21).

112.    Detective DeMoya gave instructions to the officers that no one was to come in or out of the apartment while he secured the search warrant.  Detective DeMoya did not re-enter the apartment after he completed the security sweep.

113.    While Detective DeMoya secured the search warrant, Concepcion and Ms. Sweeting were placed in the back of a marked police car that Detective DeMoya had outfitted with an audio recorder.

114.    A conversation between Concepcion and Ms. Sweeting was recorded, during which they discussed the presence of a gun and narcotics in the apartment, as well as how to get rid of the gun (Gov't Ex. 4).

115.    While Concepcion and Ms. Sweeting were in the marked police car, officers remained outside the vehicle and did not ask Concepcion any questions.

116.    The recording of Concepcion and Ms. Sweeting's conversation is 32 minutes in length.  Detective DeMoya listened to it before he obtained the search warrant and alerted the

officers at the scene that there was a gun in the apartment and that Concepcion and Ms. Sweeting were trying to get people to remove it; so he gave strict instructions that nobody could go in or out of the apartment.

117. When executing the search warrant, Detective DeMoya found the gun where Concepcion said it was in the recording. Detective DeMoya also found a large amount of marijuana, narcotics packaging equipment, drug paraphernalia, U.S. currency, and ammunition.

118. After completing the search authorized by the warrant, Detective DeMoya interviewed Concepcion and Ms. Sweeting at the police station, post-Miranda warnings.

119. The interview of Concepcion was recorded (Gov't Ex. 5). Concepcion denied ownership of the gun found in the apartment, but acknowledged that the ammunition and narcotics were his.

120. Concepcion also stated that the apartment was his side girlfriend's (Ms. Sweeting's) place, that he didn't stay there all the time, that he had never stayed the night there, that he never had keys to the apartment, and that he didn't keep clothes there.

121. In her recorded statement, Ms. Sweeting stated that she and Concepcion were real close, like boyfriend and girlfriend on and off for a year and a half;[20] that he was allowed to be in her house using her keys but did not have his own set of keys; that he would be at her apartment like one night a week because he had kids and had to go home; but that he would be there during the daytime while she was at work (Def's Ex. 11). See also Defendant's Post-Hearing Brief [D.E. 70 at 10-11].

122. During the course of the police station interview, Concepcion's conduct was still respectful and cordial, as before; and his demeanor and clarity of speech were similar to what he

---

[20] As noted above, Concepcion had a different girlfriend in 2012, namely, Ms. Warren, the owner of the Infiniti that Concepcion crashed on August 19, 2012.

exhibited during the August 19, 2012 interview at Ryder.

123.    Detective DeMoya identified the photographs from the crime scene showing the evidence that was recovered from the apartment (both in the original locations and assembled on a table), and the opened front and back doors of the apartment (Gov't Exs. 2A through 2I).

124.    Detective DeMoya acknowledged that he took all of the photographs of the crime scene that were produced by the government in a CD (Def's Ex. 14).

125.    One of the photographs shows a pair of red shoes (Def's Ex. 10, at Concepcion _000486).[21]

126.    At the request of defense counsel, the undersigned took judicial notice of the fact that, on October 14, 2015, the sun set at 5:54 p.m. (Def's Ex. 22).

127.    Although Mr. Conrad's expert testimony, set forth below, supports the conclusion that Detective DeMoya's security sweep of Ms. Sweeting's apartment took just over a minute longer than his estimate of 30 seconds, the undersigned does not finds that this variation renders Detective DeMoya's testimony regarding the scope of the security sweep not credible or unreliable.

128.    The undersigned accepts Detective DeMoya's testimony as an accurate description of his participation in the events of October 14, 2015.

### B.    *Officer Alvarado*

129.    On October 14, 2015, Officer Alvarado was on foot patrol at 1360 Sharazad (which is part of an apartment complex known in the community as the APTs), when he came across Concepcion.

130.    Officer Alvarado had previously encountered Concepcion on August 1, 2015, loitering on the west side of 1360 Sharazad, notwithstanding a "No Loitering" sign on the

---

[21]  Defense counsel attempted, but failed, to obtain an admission that the shoes are men's sneakers.

property. At that time, Officer Alvarado issued a verbal trespass warning to Concepcion and generated a field contact notation in the Opa Locka Police Department's records system.

131. Officer Alvarado had also encountered Concepcion on August 22, 2015 at the same location, loitering again. When Officer Alvarado approached Concepcion, he took off running. Officer Alvarado made a report of that encounter.

132. On October 14, 2015, Officer Alvarado learned from Detective DeMoya that Concepcion was at 1360 Sharazad, and that there was some kind of narcotics issue or involvement.

133. When Officer Alvarado saw Concepcion, he was with a couple of other males, and there were multiple baggies on the ground that appeared to contain marijuana.[22]

134. Officer Alvarado told Concepcion to stop, but he took off running. The other males also took off and scattered in different directions.

135. Officer Alvarado started chasing Concepcion, but decided to stop, keep a visual on him, and call for back up.

136. Some detectives who were in the area started pursuing Concepcion as he ran to a set of buildings across the street.[23]

137. Officer Alvarado observed Concepcion peek his head out a door, close the door, then abruptly come out and run towards the north side of the property towards a little common area, where officers converged to take him into custody.

138. Officer Alvarado then arrested Concepcion on the August 22, 2015 trespass, the October 14, 2015 trespass and resisting without violence.

139. The undersigned accepts Officer Alvarado's testimony as an accurate description

---

[22] When Officer Alvarado returned after the chase described below, the baggies were gone.
[23] Officer Alvarado was referring to 1325 Sharazad.

of his participation in the events of October 14, 2015.

### C. Mr. Conrad

140. Mr. Conrad was accepted as Defendant's expert in metadata.

141. Mr. Conrad utilized the ExifTool application to extract the time stamp from the photographs that Detective DeMoya took at Ms. Sweeting's apartment on October 14, 2015 (Def's Exs. 24, 25, 28).[24]

142. Based on Mr. Conrad's analysis, the time stamps on the images numbered 1508 to 1517, which were taken inside Ms. Sweeting's apartment during the security sweep, spanned a period of one minute fifty-one seconds, from 5:57:56 p.m. to 5:59:47 p.m. (Def's Ex. 29).[25]

143. The undersigned accepts Mr. Conrad's expert testimony regarding the time stamp metadata of the pictures as reliable.

## CONCLUSIONS OF LAW

Based on the foregoing factual findings and legal authorities, the undersigned concludes as follows.

### A. The arrests

(1) August 19, 2012. Concepcion was in custody either at the time he was placed in the back of the police car by Officers Horn and Borrero at the crash scene, or at the time Officer Gonzalez handcuffed him. By then, Officers Horn, Borrero and Gonzalez had probable cause to believe that Concepcion had committed traffic violations and eluded Officer Gonzalez in a high speed chase, which resulted in the Infiniti being overturned. Therefore, Concepcion's August 19, 2012 warrantless arrest was legal. Beck, 379 U.S. at 91; Burgos, 720 F.2d at 1524 n. 4.

---

[24] Mr. Conrad performed a test to verify the accuracy of the ExifTool application regardless of the type of camera used to take the photographs (Def's Ex. 26, 27). Mr. Conrad also reviewed the time stamp Windows properties of the photographs taken by Detective DeMoya versus the time stamp information provided by the ExifTool application and found that they matched (Def's Ex. 29).

[25] The parties stipulated that Ms. Sweeting's apartment was a small, one bedroom apartment.

(2)     October 14, 2015. Officer Alvarado had probable cause to arrest Concepcion on October 14, 2015, based on his August 22 and October 14, 2015 trespasses at the APTs, and his resisting without violence by running into Ms. Sweeting's apartment after Officer Alvarado had told him to stop. Therefore, Concepcion's October 14, 2015 warrantless arrest was legal. Beck, 379 U.S. at 91; Burgos, 720 F.2d at 1524 n. 4.

### B.    The searches and seizures

(1)     August 19, 2012. Detective Jean-Francois obtained consent to search the Infiniti from Ms. Warren, the vehicle owner. Therefore, the August 19, 2012 warrantless search of the vehicle and the seizure of the Norinco rifle and Count 1 ammunition that were found inside it were not illegal. Freyre-Lazaro, 3 F.3d at 1500-01; Schneckloth, 412 U.S. at 219.

(2)     October 14, 2015. According to Ms. Sweeting, Concepcion was only allowed to be in her apartment using her keys because he did not have his own set of keys; he would be at her apartment at most one night a week because he lived with his family somewhere else; and he was at the apartment during the daytime while Ms. Sweeting was at work. Thus, Concepcion cannot claim that the October 14, 2015 search of Ms. Sweeting's apartment was illegal because he did not have a privacy interest in the premises. Rakas, 439 U.S. at 133-34; Robinson, 62 F.3d at 1328; Ford, 34 F.3d at 995.

Even if Concepcion had standing to make a Fourth Amendment illegal search claim, such a claim fails. Detective DeMoya was justified in conducting the initial security sweep to ensure the safety of the officers who had pursued Concepcion to the location (and that of Ms. Sweeting), after Ms. Sweeting opened the back door and came out crying, extremely nervous and shaken up, saying "they" just ran up in here. And the taking of photographs during the security sweep did not vitiate the need to conduct it. In this regard, the presence of someone's gloved hand holding

an interior door of the apartment, as shown in one of the photographs, is explained by Detective DeMoya's testimony that he conducted the security sweep with the assistance of some of the officers. And the file on a table in the apartment's living room belonged to Detective DeMoya. Moreover, the undersigned finds that the security sweep did not last longer than necessary to secure the premises, even if it lasted one minute fifty-one seconds, rather than Detective DeMoya's estimate of 30 seconds, and even given the stipulation that the apartment was a small, one bedroom apartment. In addition, Detective DeMoya did obtain a search warrant after conducting the security sweep, which relied on his finding narcotics at the apartment in plain view. Therefore, the search of Ms. Sweeting's apartment and the seizure of narcotics, firearm and ammunition from it on October 14, 2015 were legal. Buie, 494 U.S. at 335; Horton, 496 U.S. at 136.

### C.    *The statements*

(1)    August 19, 2012.    Concepcion makes a two-pronged attack on the constitutionality of his post-Miranda statements to Detective DeMoya at Jackson. Concepcion first argues that the post-Miranda statements were vitiated by Detective DeMoya's pre-Miranda conversation with him. However, what the case upon which Concepcion relies prohibits is obtaining a pre-Miranda statement, covering the same ground, and then obtaining a repeated statement. Seibert, 542 U.S. at 604. Here, Detective DeMoya first talked to Concepcion about how he was feeling and about the shooting incident in the Back Blues, asking him what happened; what went down; and how did Concepcion end up in this type of situation; and the questions to Concepcion about the rollover of the Infiniti, which is the basis of Count 1, came after the Miranda warning. Therefore, the undersigned concludes that this case does not fall within the scope of Seibert's prohibition. Id. Concepcion next argues that Concepcion's waiver

of his Miranda rights was ineffective, based on Dr. Colino's expert testimony. However, the undersigned has rejected that testimony as speculative and unreliable. Therefore, Concepcion's post-Miranda statements on August 19, 2012 are not subject to exclusion. Id. at 608.

(2) October 14, 2015. The statements made by Concepcion while he and Ms. Sweeting were in the back of the police car that Detective DeMoya had outfitted with a recording device were not the result of police questioning. Therefore, they do not require exclusion on the grounds that they were obtained without Miranda warnings. Seibert, 542 U.S. at 608. With regard to statements made by Concepcion at the police station, those were made after Miranda warnings and after Concepcion had been legally arrested by Officer Alvarado. Therefore, the statements are not subject to exclusion. Id.

## RECOMMENDATION

Based on the foregoing considerations, the undersigned respectfully recommends that Concepcion's Motions to Suppress be DENIED. Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Robert N. Scola, Jr. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Miami, Florida this 6th day of September, 2017.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Robert N. Scola, Jr.
       Counsel of Record